All right, our final case for today is Tatum v. Foster. Ms. Ambrosio May it please the court, Kerry Ambrosio here on behalf of the petitioner appellant, Mr. Robert Tatum. The core of FREDA is respect for the defendant's autonomy to choose whether or not the defendant would like to avail himself of the advantage of counsel or whether he would prefer to represent himself. So let me ask you this Ms. Ambrosio, we've been encountering a number of these cases lately. Do you think that the Wisconsin Supreme Court's decision in State v. Klessig simply fails to reflect what the U.S. Supreme Court requires in FREDA cases? Not necessarily. This heightened standard for competence that they talk about. Your Honor, I would argue that only to the extent from what I've read that would be the case that it would be a competency standard that would be contrary to FREDA when it requires legal proudness. So in this case, the way I read the denial of Mr. Tatum's right to represent himself was, in the context of the court proceeding before the trial court, there was no warning that was administered. There was simply a short list of questions that were asked and once Mr. Tatum outlined what his investigation had been in terms of defending against these homicide charges, the judge very quickly and summarily stated, I'm denying you this right you cannot appreciate which is the second prong of the Klessig inquiry. If I can follow up on that a little bit, I had a very similar question to Judge Woods but what I'm wondering is not whether Klessig is wrong, it seems to me that for its purposes it's probably quite appropriate to say, look, we the state Supreme Court are going to give courts guidance. If you want a valid waiver of your Sixth Amendment rights, you've got to go through this fairly detailed colloquy just as the federal courts have done with, for example, guilty plea colloquies. And when it's used for those purposes to ensure that a waiver is valid, it's perfectly appropriate. What I'm troubled by is what seems to be a pattern of misuse of Klessig to deny requests by competent, if perhaps foolish, defendants by imposing this higher standard. And I would agree with that, Your Honor. What I have seen with Klessig is, of course, the intention is to protect defendants from their own poor decisions. The intention is to be able to show that they have voluntarily or intelligently waived this right to assistance by counsel. The problem is the way I have seen it applied in the Wisconsin courts is to require that if any inquiry is made at all by the trial judge, that the defendant must prove his circumstances support the waiver. And as this court in the recent decision in Imani versus Pollard showed, what that results in is, in effect, a burden shift to require the defendant prove he made a quality waiver when, in fact, it's the trial court's responsibility to do so. So a couple of things. The burden shifting is inappropriate, according to Feretta. Secondly, requiring defendants in Wisconsin to show or to have legal competence is absolutely contrary to Feretta. And that's what I've seen in this line of cases. So let me give you on the one hand, on the other hand here. So on the one hand, looking at this relatively brief but interesting colloquy between Mr. Tatum and the court, Mr. Tatum actually comes off really well. I mean, he seems to understand what the trial's about. He gets the penalties. He talks. He knows what voir dire is. He's actually pretty well informed about the process. So that's the on the one hand. And of course, not as well informed as a good criminal defense lawyer would be. But Feretta has warned us not to require that. No lay person is going to be that competent. The other hand, and I'm wondering whether this is enough to save what the Wisconsin courts did, is that Mr. Tatum seems to be seized with paranoia about what his appointed lawyers are doing. He's going through a couple of appointed lawyers. He thinks they're conspiring with the prosecutor. And you do have Godinez. And you have some later cases that suggest that actual mental disability is maybe a different matter. And so I wonder whether we should take that broader set of behaviors into account, whether we look only at the colloquy, and how we should deal with these two currents that I see. Your Honor, I would submit that Mr. Tatum really did exhibit certain behaviors which aren't ideal in a courtroom. They're kind of paranoid. I mean, he thought that the lawyer was slipping information to the prosecutor, right? Well, I think that there was perhaps that was resulting. He did have three attorneys in a short period of time. It was pretty clear from the get-go that Mr. Tatum was not going to be happy with his all of these cases dealing with the Sixth Amendment right to represent oneself. Difficult is one word you could use to describe these folks. And it might be appropriate to say all of these defendants were somewhat difficult, and that they would be difficult. In Mr. Tatum's case, his delusions, I would argue, do not rise to the level that they in a district court case in this building, in the Berry case, where the defendant was, I believe this is the case where the defendant had said that he had met with Secretary Rice, that he had been defrauded by Citibank to the tune of $420 million. And the district court in that case allowed him to represent himself at trial, even though these factors existed before he invoked the right. If I remember correctly, and the court found that there must be some limit to the limitations, that the mental illness, the delusions, and I believe delusions were of the record, did not rise to the level of Indiana v. Edwards, which was a severe mental illness, schizophrenia. Here, the record shows us that Mr. Tatum does not have a lengthy mental health history, which is different than Indiana v. Edwards, where there was a significant record of that. Additionally, Mr. Tatum's sole diagnosis, beyond he's difficult to deal with, in the docket of the district court was that he had been diagnosed, at best, with a personality disorder not otherwise specified. I don't really understand what that means, but I don't think it rises to the level of a severe impairment. Can I ask you a couple of questions about that? First of all, did the state courts rely on any conclusions or make any findings about severe mental illness? In terms of denying him the right? Neither the trial court nor the appellate court mentioned his mental illness as a basis. And in fact, Dr. Truman, who provided the more detailed report to the state trial court, found no delusions and rejected all these other potential diagnoses that might have supported a finding, in theory, under Godinez or Edwards. Correct. So your bottom line just has to be that Wisconsin, at least in this one case, was setting the bar, wasn't drawing the right balance between the Sixth Amendment right to effective assistance of counsel, on the one hand, and the Feretta right to represent oneself, on the other hand, because it was looking for too much competence. It has the report in front of it from the investigator that he's competent to stand trial, despite Ms. Erickson's skepticism about that conclusion, but they didn't have to pay any attention to Ms. Erickson on that point. And this brief encounter that seems to show he does know what a trial is about, and you say that that was enough, that he should have been allowed to represent himself. Correct, Your Honor. And what I'm most struck by is the denial in close proximity to Mr. Tatum, running through not only his understanding of trial procedure, but also running through what he had done so far in terms of an investigation for his defense, ending with, I understand that I'm at a disadvantage here, operating from a jail cell. He recognized, he very clearly recognized that he was at a disadvantage, and then said, but even so, essentially he said, even so I want to represent myself. I'm concerned about that immediate denial. The concern is also that now, is there a higher bar such that incarcerated defendants aren't able to exercise the right to represent themselves. That's concerning. Okay, thank you very much. Mr. O'Brien. May it please the Court, Assistant Attorney General for the State of Wisconsin, Daniel O'Brien, appears on behalf of Warden Foster. Had Mr. Ferretta, in 1975, presented with the same impairments, both mental and practical, that Mr. Tatum presented in 2011, and had the AEDPA been in effect in 1975, when Ferretta was decided, I am confident that the Supreme Court would have upheld as reasonable the California trial judge's decision to deny Mr. Ferretta self-representation. At the very least, a fair-minded jurist could agree or disagree with that conclusion. I'm concerned about the legal standard, though, because it seems that the Wisconsin courts have gone off on a tangent, thinking that there's basic competence to stand trial. Ferretta itself makes it very clear that there are not two competence standards. There's a long discussion in the Ferretta opinion about this. And the Wisconsin courts are looking for somebody who, at least in Mr. Tatum's case, who is really going to do a decent job representing himself. And it's kind of a paternalistic approach that the Supreme Court has never endorsed. And so I'm not, obviously we are here in the post-AEDPA era, but I don't see how this conforms to the Supreme Court's guidance. But then if that's the case, then this court has to overrule Brooks v. McCautry, which in 2004, this court upheld Wisconsin's separate competency to waive counsel and to with counsel standard. There's clearly a little bit of distance. There is a gap between mere competence to stand trial with the help of counsel. And Godinez and Edwards tell us, and that's consistent with Brooks, that there can be a higher standard if you're dealing with, for example, severe mental illness. But I share Chief Judge Wood's concerns that this line of cases seems to be a little off the rails in Wisconsin, where they're looking for somebody who has the skills of a lawyer. Well, they're not, well, I think that's not correct. I think here, the judge wasn't looking for someone who had the skills of a lawyer. It was looking for someone... We read the exchange between the judge and Mr. Tatum. And after he establishes the education point, he says, how does a trial work, sir? So Tatum answers, opening statements. And then what happens right after opening statements? State their appearance. How do we get a jury? Voir dire. How does that work?  Tatum correctly says you have a certain amount of strikes, peremptory strikes, strikes for cause. What kind of difficulties would you have? Well, I'm going to have a little trouble investigating. This is very specific. And yet the record also shows, and again, you talked about there were kind of cross two different paths here, that he does have an awareness. He is able to read. Unlike Jordan V. Hepp, he's not illiterate. On the other hand, there is this other strong evidence indicating that there's questions of even his ability to be competent enough to assist counsel, had counsel recommend him. But the court resolves those in favor of his competence. And the court does not rely on that in denying him the right to self-represent. No, but I think... That's my problem. See, and I would point this court, you question whether Klessig is even good law. But if it's not, then neither is this court's decision in Koops v. Neal and Kidd v. Lemke, which we consider... Counsel, Klessig is good law for its purpose. And in Koops, which actually is not good law at this point... Koops has been vacated because of... Okay, but the point is that in those cases, defendants were allowed to represent themselves. And the issue is, was that a valid waiver of the Sixth Amendment rights? And the Klessig Colloquy serves that purpose well. The problem is distorting it, turning it upside down, as happened in Imani, where a court says, in essence, if you don't satisfy this, then I will not let you represent yourself. And that doesn't work. But then I go back to Kidd v. Lemke. If we're not going to rely on Koops, I'll go back to Kidd v. Lemke, which is interpreting Iowa v. Tovar, which talks about factors very similar to the Klessig factors and also directs this court, because we're under AEDPA review, to look for reasons that do or could have supported the trial judge's ultimate conclusion that he was unaware of the dangers and disadvantages of self-representation. So it's the judge's job to make him aware under Feretta in that line of cases. The judge can't keep him in ignorance about those points and then say, no, you can't represent yourself. That's very clear. Well, I think that would be more significant if he allowed him to represent himself without being aware of the dangers. Mr. Tatum is claiming that he was aware. There's no issue in this. The problem is the judge has asked him questions about what does it really mean. He isn't on the topic of, you know, it's often a foolish thing to do because a good lawyer is going to do better for you. He's giving like a mini LSAT to Mr. Tatum. And because Mr. Tatum isn't answering the questions as well as a lawyer would, he's told he can't represent himself. And as Judge Hamilton says, that's kind of the reverse of what's going on in terms of the question, how much do you have to tell somebody? You know, especially under the ADBA review. It's also in the context of everything this judge has observed in the months leading up to this point and in the context of the reports that he received from the doctors. Saying that he's competent. Why is that? Yeah, but you have to look closely. I refer to pages 37 and 38 of our brief where I discuss in detail Dr. Collins' and Dr. Truman's reports. Actually, I had a question about that, Counsel, because at page 38 of your brief, you seem to be relying upon the preliminary evaluation of the junior person whose diagnoses were then rejected by Dr. Truman, who said personality disorder not otherwise specified, and basically went through those preliminary items and said those really aren't confirmed. Does not have a specific problem or disability that can be identified. That may prevent a meaningful defense from being offered. Neither suggests the presence of delusions or other symptoms of mental illness, etc. This is about as, I don't see any factual foundation for anything like a Godinez or Indiana against Edwards denial of competency. Well, I believe those were bad. I think Dr. Collins' report, and I think the judge could also take into account and was certainly aware of both Dr. Collins' and defense counsel's concern, and Dr. Collins' detailed statements why she was concerned about his paranoid delusional beliefs. But she says I can't decide. She can't decide. That's why there's a referral to Truman. Right, and Truman said he was competent to stand trial, which meets the Tuskegee standard. But I don't, you know, I think that a judge can. Excuse me, Counsel, did the state courts rely on mental illness to justify this decision? No, and if this case was before the court on direct review. Counsel, Counsel, please. Did they make any factual findings that would support such a conclusion? Well, the trial judge ultimately said I find that he is not able to appreciate the consequences, especially in light of his circumstances. Now, one could read into that just his custodial status, which was practically impaired his ability, but also these reports that he was aware of that creates doubt, legitimate questions about his mental capability and his capability, not just of understanding things, but observing courtroom decorum, behaving in the courtroom. Was there any record of misbehavior in the courtroom? There, repeated outbursts and that sort of thing throughout the proceedings, uh, not violence or anything like that, as far as I'm aware. Just speaking up from time to time? Yeah, you know, interrupting, interrupting his attorney, interrupting. And, and, but, and, but also the, his contentions throughout, uh, that his, the paranoid beliefs about his attorney, he basically sabotaged the representation by three different appointed attorneys by accusing them of bizarre behavior, including accusing attorney Erickson of falsifying a jail inmate's report that was prepared six months before she was even appointed to the case. And then saying when he was confronted with that bizarre fact, he said, well, maybe she backdated it. So I think, I think when you look at the record, as Kid v. Lemke requires his court to do, even if it's not satisfied with the judge's decision, if when it reviews the record, the record supports the reasonableness of the double deference owed by the ADPA. All right. Thank you very much, Mr. O'Brien. Your time ran out, Ms. Ambrosio, but I will give you one minute if you have anything else you'd like to say. Just quickly. Thank you, Your Honor. I just wanted to say that Mr. Tatum, as we said in our brief, and also as I said here today, did validly waive his right to counsel. And he did so even according to the, what is the correct application of the heightened Wisconsin standard of classic. What I would suggest to the court is this line of cases, Imani, the most recent, and Mr. Tatum's case, shows that there seems to be a misinterpretation of the second prong of that inquiry, so that a heightened standard of competency is applied that is flatly contrary to PRETA. And we would ask that the court take note of this, vacate the judgment of the district court, and remand with instructions to issue a writ of habeas corpus. All right. Thank you. Thank you very much. Thanks to the state as well. We will take the case under advisement and the court will be in recess.